Doyle DAVIS, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. B–C–85–26.

United States District Court,
E.D. Arkansas, N.D.

Oral Findings of Fact and Conclusions
of Law Dec. 27, 1985.

Opinion Feb. 25, 1986.

John M. Belew, Bill H. Walmsley, Harkey, Walmsley, Belew & Blankenship, Batesville, Ark., for plaintiffs.

Richard M. Pence, Asst. U.S. Atty., Little Rock, Ark., for defendant.

## FINDINGS OF FACT & CONCLUSIONS OF LAW

EISELE, Chief Judge.

This is essentially a malpractice case against the United States of America brought under the Tort Claims Act by Mr. and Mrs. Doyle Davis for alleged negligence on the part of certain staff doctors at the Little Rock Veterans' Medical Center on October 14 and 15, 1982. Mr. Davis, who was 56 years old at the time, is a retired Air Force non-commissioned officer and a practicing Jehovah's Witness. In keeping with his religious principles, he refused to receive blood transfusions while at the V.A. Hospital. In essence, the plain-

tiffs claim that the medical staff failed to respond appropriately to the knowledge that Mr. Davis would not accept blood. According to the plaintiffs, the defendant's agents negligently misled them and caused them to delay obtaining alternative medical services and the delay, in turn, they contend, resulted in injury and damage to Mr. Davis.

Before getting into the details of the case, it is important to note that Mr. Davis was in the care of the V.A. Hospital for something less than 36 hours. On the morning of October 15, 1982, he was released, against medical advice, so that he could be flown to Houston where a Dr. Dudrick had agreed to accept his case. Dr. Dudrick performed surgery which apparently successfully repaired the bleeding ulcer which had been the basis for Mr. Davis' original admission to the V.A. Hospital in Little Rock. However, the plaintiff, Mr. Davis, was in a coma for some 29 days after the operation and, sometime after his release and return to his home in Batesville, Arkansas, he developed a back problem which has been diagnosed variously as spondylolisthesis.

Plaintiff contends that the doctors at the V.A. Hospital were negligent either in their failure to perform surgery without the availability of blood transfusions or in their failure to promptly refer plaintiff to some other doctor who would perform such surgery.

The Court, in a pretrial discussion on the record, indicated its doubt that the plaintiffs could prevail, under the facts then admitted, upon either such theory, at least as narrowly stated above. However, the pretrial submissions and the plaintiffs' attorney's statements suggested that the plaintiffs' main complaint was that the defendant medical staff negligently failed to inform the plaintiffs of Mr. Davis' true medical condition and of the limitations upon the scope of medical treatment that would be available to him at the V.A. Hospital, thereby causing the Davises to delay their decision to send Mr. Davis to Houston.

The plaintiffs further contend that the medical evidence would support a finding that it was this delay which caused Mr. Davis the back problem of which he presently complains. It is important, therefore, to determine whether any of the V.A. doctors were negligent and, if so, whether that negligence was the cause of any identifiable, appreciable, inappropriate delay in Mr. Davis' receiving needed medical care.

And, of course, assuming the plaintiffs could show that the staff's negligent acts caused plaintiffs to delay their obtaining of alternative medical treatment, then the following question of medical causation would arise: Can it be said with a reasonable degree of medical certainty that the back condition presently suffered by Mr. Davis was caused or contributed to by the delays? And, of course, the plaintiffs have the burden of proof upon the issues of negligence and causation.

The Court has already discussed with the parties the holdings recognized by the Eighth Circuit that physicians employed by the United States Government are entitled to the "discretionary function" exception of the federal Tort Claims Act. It's interesting to the Court to note that the Arkansas law in this area of negligence is to the same effect exactly. That is, the Arkansas law also gives to physicians the same type of protection for honest differences of medical opinion. I think the Ricketts v. Hayes case, 256 Ark. 893 at pages 903 and 4 makes that quite clear.

It is the Court's understanding of the law that none of the doctors involved in this case could be held responsible for refusing to operate on Mr. Davis because of the unavailability of the possibility of the use of blood transfusions since the Court finds that such decisions were reasonable professional medical judgments as to the best and most appropriate treatment of Mr. Davis' condition.

And this would be true even if the plaintiffs were willing to execute an agreement which would prevent the Davises from recovering in a lawsuit should Mr. Davis suffer injury or die as a result of the

physicians not being permitted to use blood transfusions. A physician, under the law, does not have to engage in what he believes honestly to be bad medical practice simply because he is held harmless from potential legal liability.

It is important to review Mr. Davis' medical condition and the actions of the V.A. staff during the entire period of his stay at the hospital.

Mr. Doyle Davis arrived at the emergency room of the Little Rock V.A. Hospital around 1:00 a.m. on the morning of October 14, 1982. Before his actual admission, he advised the attendants that he was a member of the Jehovah's Witness religion and that because of his religious beliefs, he would not permit himself to be transfused with blood.

The plaintiffs have suggested that, because of the limitations upon the potential medical treatment options which were available under the circumstances, Mr. Doyle Davis should never have been admitted to the V.A. Hospital at all. The Court rejects this contention. The V.A. Hospital's policy is to provide medical services to eligible veterans without respect to religious convictions. Mr. Davis is a retired Air Force master sergeant having served in the Air Force for slightly over 20 years. Whether Mr. Davis' religious views might create any problems in his treatment certainly could not be known before he was tested and diagnosed.

Dr. Gail McCracken saw Mr. Davis around 2:30 a.m. The initial impression was that he was suffering from a gastrointestinal bleeding ulcer with volume depletion. But she recognized that there are a variety of reasons for intestinal bleeding and a variety of different treatments.

As in most hospitals, the V.A. Hospital has various services which interrelate with each other on a consultative basis. Mr. Davis was assigned to the internal medicine ward, which was appropriate under the then existing circumstances.

When Mr. Davis arrived in the emergency room, his hematocrit reading was 35 and his hemoglobin reading was 11.3. However, Dr. McCracken did not feel these numbers to be accurate because, after an acute episode of bleeding, there may be a lag in one's ability to obtain accurate readings as a result of a phenomenon known as "volume depletion." Mr. Davis' blood pressure was taken in the standing, sitting and lying positions. Since he had a significant postural drop in blood pressure, Dr. McCracken was satisfied that Mr. Davis was suffering from volume depletion due to a bleeding and hemorrhaging episode which occurred before he arrived at the hospital. Her findings suggested that the actual hematocrit and hemoglobin readings could be considerably lower than those recorded.

Both the hematocrit and the hemoglobin readings provide an indication of the oxygen-carrying capacity of the blood. The hematocrit reading is determined by centrifuging out the red blood cells and relating the measurement obtained to the blood fluid volume. The postural drop in the blood pressure would, as indicated, reveal a volume depletion. Dr. McCracken also noticed that Mr. Davis, upon initial examination, was weak and in a state of shock. He was therefore given intravenous solutions to correct this volume depletion and to restore his true blood pressure. Sometime around 4:00 a.m., Mr. Davis' blood pressure returned to its proper level as would be indicated by insignificant differences in the blood pressure readings whether taken sitting, standing, or lying down.

Considering her examination, the laboratory results, and her appraisal of Mr. Davis, Dr. McCracken would have given him a blood transfusion at this point if he had been willing to accept it. A blood transfusion would not only help fight shock and restore blood pressure; it would directly and promptly improve the hematocrit and hemoglobin numbers and thereby increase the oxygen-carrying capacity of the blood.

Since Mr. Davis was not willing to accept such a transfusion, her professional judgment was that he should be continued on a

conservative therapy and be continually observed. There was no evidence of further bleeding of any significance that night, and it is interesting to note that Mr. Davis' condition was listed only as "seriously ill." It wasn't until approximately 11:00 a.m. on the morning of the 14th that Mr. Davis began bleeding again. Dr. McCracken then called the gastroenterology service to look at the case and that service performed an endoscopy, which physically located the bleeding duodenal ulcer. It was described as a slow, active bleeding with no blood vessel in the ulcer. It was after the endoscopy that Dr. McCracken sought a consultation with the Surgery Service. Dr. Fiser, a second year resident, was the active participant on behalf of the Surgery Service.

Dr. Fiser reviewed the case and discussed it with Dr. Eason, the head of the Anesthesiology Service, and also with his own boss, Dr. Thompson, Assistant Chief of Surgery. Mr. Davis' hematocrit reading was 26.4 and his hemoglobin 8.8. Dr. Fiser was advised that the American Society of Anesthesiology had a published standard proscribing placing any patient asleep under a general anesthetic whose hematocrit was below 30 and when hemoglobin was below 10. And he was advised that the Surgery Service followed the same standard. Ordinarily when the readings are below these levels, transfusions are given to bring them up to acceptable levels before considering surgery. However, according to the testimony—and the Court so finds—if a patient is in imminent danger of death from massive bleeding, the V.A. policy would permit operating below those levels where conservative measures had failed. In fact, Dr. Thompson testified that in such event the hospital might well transfuse the patient and worry about the consequences later.

Clearly the case would not have been handled differently by Dr. McCracken before the afternoon of the 14th because she was not even aware that Surgery would not operate on Mr. Davis prior to that time.

The slow bleeding that started around 11:00 a.m. on October 14th apparently continued a few hours. But it appears to have stopped at least by 3:00 p.m. The hematocrit reading was 20.4 at 6:00 p.m. and had slipped to 16 by 1:30 a.m. on the 15th of October. It did not change appreciably thereafter, from that time until Mr. Davis was operated on in Texas later on the afternoon of the 15th of October.

Both Dr. McCracken and Dr. Fiser made it clear to the family and close friends of Mr. Davis throughout the afternoon of October 14th that he was in very serious condition and that he greatly needed a transfusion and that if Mr. Davis started bleeding again and needed surgery, the V.A. Hospital would not operate.

Mr. Davis' brother sought assurances from Dr. Fiser that if Mr. Davis' condition deteriorated, the family would have sufficient time to seek alternatives. Dr. Fiser said that he could see no problem with that. And the truth is that Mr. Davis' condition did not deteriorate thereafter. Plaintiffs did have sufficient time to seek alternatives. However, as noted below, it is questionable whether the alternative they chose was the best for Mr. Davis. The doctors also made it clear that such circumstances could create a serious risk of death.

We have had testimony about the note signed by Mr. Davis in the medical record which states: "I refuse the administration of blood transfusion. The potential risk of this action has been explained to me." I think it is signed in a weak hand by Mr. Davis. Although the Court accepts that Mr. Davis thought he was signing a legal release, it also finds, as he himself acknowledged, that what was stated in that writing, which I have just read, had been told to him and that it was understood by him.

As is often the case in circumstances such as these, the family does not really want to accept what it is hearing. There is a tendency to look for anything that might suggest that everything is going to work out all right. Here, after the bleeding stopped and Mr. Davis' condition seemed to stabilize, Dr. Fiser did reassure the rela-

tives and friends of Mr. Davis that he was doing better.

Given the fact that Mr. Davis continued to refuse a transfusion, it was Dr. McCracken's view that continuing conservative treatment was indicated. Cold water lavages were used along with drugs that would block the flow of acid or bile to the stomach and intestine. The use of other alternative conservative programs was considered. Arteriograms, embolization and vasopressure were considered and rejected for valid medical reasons. The Court fully accepts the testimony of Dr. McCracken and Dr. Ebert in this regard.

It is true that the physicians were very hopeful that Mr. Davis would change his mind and permit the use of transfusions. They were willing to try to put some pressure on him to do so. As late as the morning of the 15th of October, Dr. McCracken again asked Mr. Davis if he would accept a transfusion. She again explained the potential danger of death should serious bleeding resume. Mr. Davis refused.

The doctors found Mr. Davis weak and emotionally drained on the morning of the 15th. Since Mr. Davis was not bleeding and had not been since early the previous afternoon, Dr. McCracken felt it was not necessary that he remain on intensive care. She asked the family if they would like to have him moved to a private room where they could be with him.

Mrs. Davis and—I can't recall at this moment—perhaps Mr. Long testified that Dr. McCracken in effect told her, "We can do nothing more for Mr. Davis except move him to a room where you can be with him when he dies." Dr. McCracken denies this. She states that she only repeated what she had been saying to them since the previous afternoon and that she asked him if he would accept death before transfusion, and Mr. Davis said that he would die before accepting a transfusion. She was very worried that he might hemorrhage and possibly die without the benefit of blood. Perhaps she was more forceful in the hope that they might get Mr. Davis to change

his mind. In any event, the conversation did trigger action on the part of Mrs. Davis and her family and friends.

█ The plaintiffs argue that the defendant's doctors had a duty to refer Mr. Davis to some doctor who would agree to perform bloodless surgery. They rely upon the well established proposition that, as stated in Mallen v. Boynton, a Massachusetts case, 1882 case, ". . . if the physician was not in fact competent to treat the case, he should have instructed the patient to employ another, more skilled physician." But here the defendant's doctors were fully competent and capable of treating Mr. Davis. The problem did not arise because of any lack of medical skill. The plaintiffs are urging that the defendant's doctors had a duty to locate a doctor who would not feel constrained to follow the same medical standards that they believed were indicated. And the Court finds, in accordance with the testimony of the defendant's witnesses that, not only in Arkansas but nationally, the standard of care for the management of bleeding ulcers in 1982 under circumstances such as those as were presented by Mr. Davis' case called for transfusions of blood and the conservative measures used or explored in Mr. Davis' case. Only if such measures failed to stop the bleeding would surgery be indicated.

The Court also finds that not only in Arkansas but nationally, surgeons and anesthesiologists generally agreed in 1982 that surgery for the type of ulcer Mr. Davis had should not be undertaken when the hematocrit and hemoglobin levels were below 30 and 10 respectively. And the great majority of competent surgeons and anesthesiologists felt that such operations should not be undertaken without the availability of blood transfusions should they be needed during the course of such an operation.

Here, Mr. Davis' religious convictions made it impossible to handle the case in accordance with the then accepted medical standards. First, the doctors were foreclosed from using transfusions which they otherwise would have used immediately

upon assessing the case after Mr. Davis' admission to the hospital. And it is interesting to note that they continued to try to prevail upon him to change his mind on this issue throughout his stay at the hospital.

But the Court does conclude that defendant's doctors had the duty to keep plaintiffs informed of Mr. Davis' condition and of the limited options for treatment that were available to him at the V.A. Hospital in view of his refusal to accept blood. And this required defendant's doctors to make it clear to the plaintiffs that Mr. Davis was very sick and that if conservative treatment did not work and he began to bleed profusely and uncontrollably, then surgery would be the final recourse and this option would be unavailable at the V.A. Hospital.

The Court finds that the defendant's doctors, McCracken, Fiser and Ebert, fully and repeatedly discharged this duty properly, starting no later than the early afternoon of October 14th. The plaintiffs may not have been willing to accept and believe what they were hearing, and they were clearly reassured when Mr. Davis stopped bleeding and his condition stabilized by 3:00 p.m. on the 14th. But they were properly advised. And the Court senses that they understood that they should investigate alternatives on their own, for this is exactly what Mrs. Davis and her daughter did when Mrs. Davis returned home to Batesville on the night of October 14th. And this is what Mr. Davis, the brother of Mr. Doyle Davis, undertook to do and to investigate on the afternoon of the 14th himself.

The evidence clearly reveals that the plaintiffs and Jehovah's Witnesses generally are well aware of the medical management problems that they might run into as a result of their religious beliefs. In anticipation of such problems, they investigate the availability of medical resources in their own locale and nationally which they might call upon in an emergency. The evidence here shows that Mrs. Davis and her daughter had several lists of doctors who apparently would agree to handle various different types of medical problems without the use of blood transfusions. Of course, there are many medical procedures that do not raise any substantial risk with respect to the need for transfused blood.

The Court finds that the identification of physicians who would treat Jehovah's Witnesses for various types of medical problems in conformity with the limitation imposed by these religious convictions is not a "medical reference" problem. Ordinarily doctors without adequate skill to handle a particular medical problem should so advise the patient and indicate the appropriate medical reference. But here there was no lack of skill. Plaintiffs nevertheless suggest that the defendant's doctors should have conducted an investigation to determine which surgeons in Arkansas or the nation might be willing to operate on Mr. Davis without blood and contrary to their own view of what was the appropriate medical standard.

It is clear to the Court from the evidence that the plaintiffs had much more knowledge and information about this problem than the defendant's agents and were in a far better position to solve it than they were. Plaintiffs did, in fact, make the arrangements they desired in this case, and the defendant's doctors did cooperate in carrying out their decision.

The plaintiffs' main thesis appears to be that had the defendant's doctors properly advised them of the facts, they would have transferred Mr. Davis to Houston earlier and the operation would have been performed earlier when Mr. Davis was in better condition and that the post-operative complications would not have occurred as they did occur. The Court is convinced, as so finds, that even had the defendant's doctors been willing to operate upon Mr. Davis without blood, they would not have chosen to undertake this dangerous procedure at any time during Mr. Davis' stay at the V.A. Hospital. The Court finds that, in the exercise of responsible medical judgment, they would have continued the conservative treatment of Mr. Davis unless he started serious and uncontrolled bleeding, and this never in fact occurred.

Except for the one bleeding episode that occurred between 11:00 a.m. and 3:00 p.m. on the 14th, Mr. Davis' condition was maintained essentially stable by conservative treatment throughout his stay at the V.A. Hospital. The Court credits the testimony of the witnesses that in approximately 85% of such cases, the patients heal on their own without surgery. The Court is convinced, and so finds, that the medical treatment afforded Mr. Davis at the V.A. Hospital was appropriate and in accordance with prevailing medical standards. And it cannot say that Mr. Davis would not have recovered had he remained at the V.A. Hospital under the conservative treatment regime.

The plaintiffs point out that a transfer was required because it would at least provide Mr. Davis with more medical options than were available at the V.A. Hospital. And they point out that Dr. McCracken and the other doctors were worried that Mr. Davis might hemorrhage or seriously rebleed, thereby creating an immediate need for surgery. In fact, Dr. Fiser was at one point an advocate of surgery. But there are two answers to this: One, there was no rebleeding at any time before Mr. Davis was operated on in Houston and, therefore, the potential risk from the failure to transfer did not occur; and two, the Court is convinced that defendant's staff would have operated, probably with blood, if Mr. Davis had started hemorrhaging and a life-threatening situation developed. This has nothing to do with the legal aspects of it or whether they should have under those circumstances.

The Court has carefully reviewed the evidence concerning Mr. Davis' condition for the entire period of time that he was at the V.A. Hospital. It is convinced by the testimony that his actual hematocrit and hemoglobin counts were significantly below those recorded upon admission for the reasons I have already discussed above. It is likely that the true hematocrit was in the 26 to 27 area at the time of his admission. The later fall to a hematocrit of 16 by 1:30 a.m. on the 15th of October was probably due principally to the bleeding that oc-

curred between 11:00 and 3:00 p.m. on the 14th. Once again, there is a lag in the readings which would explain the different readings that occurred during the period.

And, as indicated, there was no significant drop after 1:00 a.m. in the hematocrit level before surgery was conducted in Houston. Even had the defendant's doctors been willing to use the surgery option, with or without blood, the Court finds that, in the exercise of reasonable medical judgment, they would not have exercised that option at any time while Mr. Davis was a patient at the hospital. The Court finds that the defendants followed reasonable and accepted medical standards and practices in managing the case conservatively; and that there were no delays in exercising the surgery option that would not have been properly made in any event.

The fact that the plaintiffs might have taken steps earlier to remove Mr. Davis to a medical facility which would be willing to operate on him without blood, if the plaintiffs had fully comprehended the entire medical situation, and this placed Mr. Davis in a situation where he might have the additional surgery option available under conditions consistent with his religious convictions should bleeding resume, becomes irrelevant in the light of the actual facts and circumstances. The Court cannot find from the evidence that the proper medical judgment would have required a surgical operation upon Mr. Davis at any time. So even had Mr. Davis been removed earlier, there is nothing in the evidence that convinces the Court that this would have benefited Mr. Davis in any way.

The evidence does suggest that Mr. Davis' weakened condition and low hematocrit and hemoglobin may have been responsible for his long post-operative coma. But there is nothing in the evidence that convinces the Court that the result would have been otherwise if the operation had occurred earlier without blood. The Court is convinced that no operation in any event should have been undertaken before 11:00 a.m. on October 14th, and it is further

convinced that any operation after that time without blood would more probably than not have had the same result as that which actually followed the operation conducted at Houston.

In the plaintiffs' post-trial argument they state:

"By contrast, the testimony of the Davises and their family was that they knew Doyle Davis was seriously ill. They knew approximately 3:00 p.m. on the afternoon of October 14th that the V.A. would not operate. They thought that Mr. Davis' condition was stable based on the assurance of Dr. Fiser."

These are important statements. Plaintiffs knew the true situation not later than 3:00 p.m. on the 14th. True, Mr. Davis' condition was stable. Furthermore, his condition continued stable during the remainder of his stay at the hospital.

The plaintiffs responded by investigating alternatives available to them on the afternoon and the evening of the 14th. They initiated self help at this time and executed such self help the next morning.

It is important to assess Dr. McCracken's state of mind on the morning of the 14th. She was clearly very worried that Mr. Davis might start bleeding again. But she had no way of knowing what would happen. The odds were that Mr. Davis would remain stable and recover. The Court is convinced that she did not tell the plaintiffs flatfootedly that Mr. Davis was going to die. But she did emphasize that he would die if bleeding started again. Perhaps she should not, in the light of his religious scruples, have made such a great effort to convince him to reconsider the use of blood. But she was urging what she, as a doctor, felt to be in Mr. Davis' best interest.

■ Finally, the plaintiffs have failed to satisfy their burden of proving that the back problems with which Mr. Davis presently suffers were proximately caused by either his treatment at the V.A. Hospital or the operation and post-operative results at Houston.

The Court was frankly impressed by the plaintiffs and their lay witnesses, and it was also impressed with the defendant's witnesses. The Court has noted the effort on the part of all concerned to be honest and candid and forthcoming with the Court. Nevertheless, the testimony as pointed out on deposition and at trial frequently revealed contradictions and inconsistencies, and it is the Court's task to sort this out in its search for the truth. The Court has attempted to do this.

The Court is convinced that Mr. Davis received competent professional care while at the V.A. Hospital. The evidence does not sustain any showing of negligence or that the back complaints he presently suffers resulted in any way from the acts or omissions of the defendant's staff.

The circumstances surrounding Mr. Davis' departure from the hospital on his trip to Houston reveal a certain bureaucratic indifference which must have infuriated Mrs. Davis and their friends. The apparent refusal of blankets, a blood pressure device, oxygen, and the apparent refusal to use a V.A. Hospital ambulance have greatly alienated the plaintiffs, even though now some explanation is given. And I think I also recall the discourtesy to Mr. Davis' brother with respect to the use of the telephone. That comes to mind. But it is the Court's firm belief that the hearts of the central players: Dr. McCracken and Dr. Fiser, were in the right place. It's apparent that they cared greatly for Mr. Davis and his welfare. The plaintiffs are fine and decent people and it is understandable why they brought this lawsuit, but the defendant's doctors are also decent, caring people. The questions raised have now been answered, and the complaint must therefore be dismissed.